J-A29040-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| THOMAS M. HOOVER, JR. | : IN THE SUPERIOR COURT OF |
| | : PENNSYLVANIA |
| | : |
| v. | : |
| | : |
| | : |
| ALICIA J. LEWIS, DECEASED | : |
| | : |
| | : No. 795 WDA 2025 |
| v. | : |
| | : |
| | : |
| LISA K. COHEN AND SHAWN COHEN | : |
| | : |
| | : |
| v. | : |
| | : |
| | : |
| JAMES R. LEWIS AND KIM LEWIS | : |
| | : |
| | : |
| APPEAL OF: LISA COHEN AND | : |
| SHAWN COHEN | : |

Appeal from the Order Entered May 29, 2025
In the Court of Common Pleas of Blair County
Orphans' Court at No. 2011-00254

BEFORE: OLSON, J., DUBOW, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:          **FILED: February 26, 2026**

In this ongoing custody dispute, currently between grandparents, Lisa

K. Cohen and Shawn Cohen (Paternal Grandparents) appeal from the order

which granted sole legal and physical custody of A.J.L. (Child) to James R.

Lewis and Kim Lewis (Maternal Grandparents).[1]  After careful consideration, we affirm.

*CASE HISTORY*

Child is 16 years old.  He was born in January 2010 to Alicia J. Lewis (Mother) and Thomas M. Hoover, Jr. (Father), who were teenagers at the time. For the majority of Child's life, he has endured the parties' "yearslong, acrimonious litigation."  **Hoover I** at *11.  This Court relayed the case history, from 2011 to 2024, as follows:

> Father did not initially acknowledge paternity, and the relationship between the families was antagonistic.  Father filed an action in 2011 resulting in an award of partial custody, which he did not exercise consistently.
>
> Between 2010 and 2015, Child and Mother resided in Maternal Grandparents' home.  In 2015, Mother married [Stepfather]. Mother and Child then moved out of Maternal Grandparents' home to live with Stepfather, but they [all] returned to live in a doublewide trailer-home located on Maternal Grandparents' property.  …  Although Child no longer lived in Maternal Grandparents' house, he had a bedroom there, and he often slept over.  Maternal Grandparents were involved in Child's life on a near-daily basis until 2020.  They often cooked for him, bathed him, and saw him off to school.
>
> Mother and Father engaged in more custody litigation between 2016 and 2017.  Mother was again awarded primary physical custody subject to Father's partial custody.  Father's exercise of

---

[1] This Court previously described Shawn Cohen (Paternal Grandfather) as a "quasi-participant in these proceedings."  **Hoover v. Lewis**, 318 A.3d 1287, 812 WDA 2023, 2024 WL 1829250, at *2 n.5 (Pa. Super. filed Apr. 26, 2024) (unpublished memorandum) (**Hoover I**), *aff'd sub nom.* **T.M.H. v. J.L.**, 334 A.3d 860, No. 29 WAP 2024, 2025 WL 1231559 (Pa. filed Apr. 29, 2025) (per curiam order).  We also observed that Paternal Grandfather is actually Child's step-grandfather as well as a practicing attorney.  **Id.**

custody continued to be sporadic. Although Paternal Grand[parents] had a good relationship with Child, Father's involvement was minimal.

In May 2020, Mother separated from Stepfather. She and Child left the trailer-home and moved to live near Paternal Grandparents, approximately 30 minutes away. According to Maternal Grandparents, Mother left because they sought to get her help for her suicidal ideations.

At this juncture, the procedural history of this custody case became incredibly convoluted. In July 2020, Maternal Grandparents filed a petition to intervene in the custody case between Mother and Father. Initially, Maternal Grandparents requested "emergency shared legal and physical custody" to "ensure [C]hild's attendance at counseling, medication, appointments, and school." Given the urgent nature of the pleading and the COVID-19 pandemic, the trial court conducted a brief video conference, prior to its evidentiary hearing, with all parties…. At the video conference, Maternal Grandparents clarified that they sought only partial physical custody.

Less than two weeks later, on August 24, 2020, Mother and Father signed a consent agreement granting Paternal Grandmother shared physical and legal custody. Maternal Grandparents were not made aware of this agreement for some time. The August 2020 consent order provided no periods of physical custody to Father, except during holidays.

In October 2020, upon Mother's request, the trial court continued the hearing on Maternal Grandparents' petition to intervene. Meanwhile, Maternal Grandparents learned of the August 2020 consent order. Maternal Grandparents then filed a "motion for guardian *ad litem*/standing/conflict." Therein, Maternal Grandparents alleged that Mother had limited their contact with Child, and they raised three challenges. First, Maternal Grandparents sought to have Child appointed a guardian *ad litem.* Second, they claimed that Paternal Grandparents lacked standing to be involved in Maternal Grandparents' bid to intervene in Mother and Father's custody case; Maternal Grandparents did not allege facts to support their own standing to seek custody. Third, they raised the potential conflict between the court and … Paternal Grandfather, a local attorney. The court scheduled the motion for a hearing.

Between October 2020 and April 2021, the litigation was delayed for various reasons. ... In December 2020, the trial judge recused himself due to Paternal Grandfather's involvement in the local bar association. The recusal meant that the matter had to be set before an out-of-county judge.

After several months in limbo, on April 5, 2021, Mother filed for custody modification against Paternal Grandmother. Mother requested th[at] Child be returned to her sole custody. Mother alleged that Child had not done well in Paternal Grandparents' school district; that Paternal Grandparents had pressured Child about his studies; that Paternal Grandmother had denied Mother access to Child and was overly critical of Mother; and that Child was depressed. When Mother filed her April 2021 modification petition, Maternal Grandparents' July 2020 action for partial custody was still pending[,] as was their October 2020 request for the appointment of [a] guardian *ad litem.* And then the character of this case drastically changed.

On April 30, 2021, Mother committed suicide. On May 11, 2021, Maternal Grandparents filed a "complaint for modification of custody." Critically, Maternal Grandparents sought custody under new grounds. For the first time, they alleged that they had standing to seek primary physical custody and legal custody under 23 Pa.C.S. § 5324; alternatively, they alleged standing to seek partial physical custody under 23 Pa.C.S. § 5325(1) (pertaining to the death of a parent).

On May 14, 2021, Maternal Grandparents, Paternal Grandmother, and Father appeared before the court. Paternal Grandmother appeared *pro se*, but the court permitted Paternal Grandfather to assist in her self-representation. Ostensibly, the hearing was on Maternal Grandparents' "petition for standing/petition for guardian *ad litem*/petition to intervene," according to the title on the transcript of those proceedings. Unfortunately, the trial court did not resolve the discrepancies in the procedural posture of the case before testimony began. In the view of Father's attorney, the [matter] before the court on May 14, 2021 was twofold: 1) Maternal Grandparents' July 2020 petition to intervene for partial custody; and 2) the October 2020 petition for the appointment a guardian *ad litem.* Counsel for Maternal Grandparents said that the matter concerned standing, the appointment of a guardian *ad litem*, "as well as a custody schedule for all parties involved." It became apparent, however, that Maternal Grandparents wanted to treat their earlier July 2020 petition to intervene as the vehicle

to preserve, as timely, their May 2021 action for primary custody. There was no mention of Maternal Grandparents' May 2021 complaint, wherein they alleged standing for primary custody and a new basis for partial custody. The court simply said it hoped to have "an interim custody order so that we can see where we are relative to maybe a further full-time custody situation." Counsel for Maternal Grandparents then called the first witness.

Starting with the May 2021 hearing, the trial court conducted four days of proceedings over the course of two years. On the first day, the trial court conducted an *in camera* interview of Child and Maternal Grandmother testified. The trial court then issued an interim order granting shared physical custody and shared legal custody to Maternal Grandparents for the rest of the summer. The order was silent on standing.

On August 3, 2021, the hearing resumed where it left off three months prior. The transcript labeled this proceeding as a "custody evidentiary hearing," but there was no mention of whether the hearing was meant to address either the July 2020 action for partial custody or the May 2021 action for primary custody. In any event, the trial court heard additional testimony from Paternal Aunt, Maternal Grandfather, Father, and Stepfather. At the end of the testimony, with the case still incomplete, the court issued a second interim order.

The second interim order was designed to last through the 2021-2022 school year, if need be. The court increased Maternal Grandparents' physical custody from shared to primary, so that Child could return to the school district where he had been enrolled until 2020. The order provided that only Maternal Grandparents and Father would share legal custody. Paternal Grandparents received partial physical custody every Tuesday and Thursday evening and one weekend per month. The second interim order provided that the next hearing date would be scheduled by separate order.

In September 2021, Father (through counsel) and Paternal Grandmother (*pro se*) petitioned the trial court to vacate the second interim order. Until then, the court had yet to deprive Paternal Grandmother of primary physical custody or legal custody. Evidently, it became apparent to Father and Paternal Grandmother that the trial court meant to resolve not just Maternal Grandparents' July 2020 petition, but also their May 2021 complaint for primary physical and legal custody. Father

- 5 -

and Paternal Grandmother reiterated that Maternal Grandparents lacked standing under 23 Pa.C.S. § 5324. The trial court did not rule on these petitions until the hearing resumed 10 months later, in July 2022.

On July 21, 2022, the hearing began with a discussion about the petitions to vacate the second interim order, which as far as we can tell, had been pending since the previous September. Father and Paternal Grandmother maintained that Maternal Grandparents lacked standing to seek primary custody under 23 Pa.C.S. § 5324. Maternal Grandparents countered that they stood *in loco parentis* under Section 5324(2); alternatively, that they had standing under Section 5324(3)(iii)(C), alleging that Child lived with them for 12 consecutive months and that … their action was timely. The court ruled that Maternal Grandparents had standing under "5324(2) or (3)," and … proceeded with testimony.

The trial court heard additional testimony from Paternal Grandparents, Father, and Maternal Grandmother. At the conclusion of this testimony, the court prepared to issue its final order and asked the litigants to file respective proposed findings and a proposed custody order by August 15, 2022. In the meantime, the court issued another interim order, dated July 22, 2022, setting forth the rest of the summer schedule. Maternal Grandparents' proposal was docketed on August 22, 2022. Paternal Grandmother did not submit a proposal but instead appealed the denial of her request to vacate the interim orders.

While Paternal Grandmother's appeal was pending, the trial court decided not to issue a final custody order, even though the court apparently recognized that it retained jurisdiction to do so. Instead, the court issued yet another interim custody order, dated August 26, 2022, meant to last the entire 2022-2023 school year. This Court quashed Paternal Grandmother's appeal as interlocutory in October 2022. The trial court took no further action for another six months, until it conducted a "status conference" on May 23, 2023.

At the status conference, the trial court learned that Child had been buckling under the weight of the litigation and in the aftermath of Mother's death. There was a pending truancy matter, Child had since enrolled in cyber school, and he might be held back a grade. Father did not appear at the status conference. Both sets of Grandparents, each represented by substitute counsel, traded blame and accusations. There had been just one

visit between Child and Paternal Grandparents …. There was doubt as to whether the recommendation of the guardian *ad litem* was valid, given his failure to interview Paternal Grandparents. Even the trial court recognized that the record had gone stale, [and] that a final custody order had to be issued so that the litigants could either appeal or initiate modification proceedings.

The court ultimately issued its final custody order and memorandum opinion on June 7, 2023 – two years after the first date of the evidentiary hearing. In its memorandum opinion, the trial court determined that Maternal Grandparents had standing for any form of custody, even as the court acknowledged that they did not meet the technical requirements under 23 Pa.C.S. § 5324. The trial court awarded Maternal Grandparents primary physical custody and shared legal custody. The court awarded Paternal Grandparents partial physical custody, which they could exercise on the fourth full weekend of each month. The court awarded Father shared legal custody and partial physical custody every Tuesday and Thursday evening, and the second full weekend of each month[,] but the order provided Paternal Grandparents the ability to assume Father's custody time if he chose not to exercise it. During the summer, Maternal and Paternal Grandparents would share physical custody.

Paternal Grandmother timely filed a notice of appeal.

***Hoover I*** at *1-6 (citations and footnotes omitted).

In ***Hoover I***, Paternal Grandmother challenged Maternal Grandparents' standing, as well as the order granting them primary physical custody of Child. This Court first addressed the standing issue. We concluded that the trial court erred "when it determined that Maternal Grandparents had standing to obtain primary physical custody and legal custody under Section 5324(3)." *Id.* at *11. Accordingly, we did not address Paternal Grandmother's other issues, "including whether the [custody] award was in the best interests of the Child." *Id.* We vacated the custody order, stating:

> We recognize that Maternal Grandparents still have standing for partial physical custody under 23 Pa.C.S. § 5325(1), due to Mother's death. Upon remand, we direct the trial court to consider whether it would be in Child's best interests to award Maternal Grandparents partial physical custody. *See* 23 Pa.C.S. § 5328(a) (relating to best interest factors); (c)(relating to grandparent considerations). We are loathe to order further proceedings but recognize the same might be necessary. Grandparents know what is best for Child. We remind them of the caustic effects that prolonged custody litigation and family infighting have on everyone, and we urge them to work together moving forward.

*Id.*

After receiving our decision in **Hoover I**, Maternal Grandparents petitioned for allowance of appeal. The Pennsylvania Supreme Court granted the request to consider whether Maternal Grandparents had standing to seek primary physical custody and legal custody of Child. *See T.M.H. v. J.L.*, 327 A.3d 615, 221 WAL 2024, 2024 WL 4448712 (Pa. filed Oct. 9, 2024) (per curiam order). However, the Supreme Court subsequently decided, in the following order:

> Pursuant to this Court's powers under PA. CONST. art. V, § 10(a) (vesting this Court with "general supervisory and administrative authority over all the courts") and § 10(c) (granting this Court "the power to prescribe general rules governing practice, procedure, and the conduct of all courts"), the trial court is DIRECTED to hold a custody hearing within thirty (30) days from the date of this order **to make a fresh assessment of standing, resolve any outstanding custody petitions, and determine a final custody arrangement that will serve the best interests of [C]hild**. **The court shall maintain the status quo of the current custody arrangement pending the issuance of a final custody order**.

*T.M.H. v. J.L.*, 334 A.3d 860–61, 29 WAP 2024, 2025 WL 1231559 (Pa. filed Apr. 29, 2025) (per curiam order) (emphasis added).

- 8 -

The Supreme Court remanded the case directly to the trial court.[2] The trial court held a hearing on May 8, 2025.[3] At the beginning of the hearing, Paternal Grandparents' counsel announced that he had "filed [motions] yesterday for the [c]ourt to consider." N.T., 5/8/25, at 1. The trial court stated that it had "not seen" any motions, and did "not know of any motions that have been filed." *Id.* Paternal Grandparents' counsel replied, "I understand," but continued to state:

> The first I want to talk about, Your Honor, with all due respect is one of recusal. We filed [a recusal motion] in reconsideration before we filed the [December 13, 2024] appeal [that was quashed on March 27, 2025, as being] from a non-final [o]rder. ... My clients have asked me to present this motion because of their concerns that they are not feeling as though the [c]ourt is viewing this in an unbiased fashion, and one of the reasons behind that, Your Honor, was when we were before this [c]ourt on July 2nd, 2024, if you recall, … the [c]ourt at that time made some statements that my clients felt were somewhat biased and felt they would really have trouble with the way this was handled, Your Honor.

*Id.* at 1-2. Paternal Grandparents' counsel also made a motion for counseling, stating that Child "has been alienated from my clients and there should be ... some form of what we call reunification counseling between him and my two clients." *Id.* at 4.

_____

[2] The Honorable Kevin A. Hess, a senior judge and former President Judge of Cumberland County, was "assigned to this case following a decision of the Superior Court in April o[f] 2024." Trial Court Opinion (TCO), 5/29/25, at 1.

[3] Father did not appear at the hearing and no counsel appeared on his behalf.

In response, counsel for Maternal Grandparents expressed opposition to the motions, arguing that the recusal issue "has already been decided," and "[t]his is the first time [Paternal Grandparents] ever brought a motion asking for reunification counseling." *Id.* at 10.

The trial court denied the recusal motion, *see id.*, and proceeded to hear testimony from the two witnesses:  Kim Lewis (Maternal Grandmother), and Lisa K. Cohen (Paternal Grandmother).[4]

*Maternal Grandmother*

Maternal Grandmother testified to being employed for decades as nurse's aide, working three days a week.  *Id.* at 13.  She stated that she "always" had "a very good relationship" with Child.  *Id.*  Maternal Grandmother explained that Child had lived with her and Maternal Grandfather, or on their property, "his whole entire life, 15 years … except for the ten months he was with [Paternal Grandparents, from August 2020 to May 2021]."  *Id.*  Maternal Grandmother testified that she and Maternal Grandfather had been "exclusively raising" Child "for at least [the past] three years."  *Id.* at 23.  She stated that Child "has his own bedroom.  I cook for him.  I do his wash.  We hang out.  We go watch the trains all the time."  *Id.*

---

[4] Although Child did not testify, his preference to remain with Maternal Grandparents was undisputed.  *See, e.g., id.* at 193 (counsel for Paternal Grandparents describing Child as "slamming the door" on Paternal Grandparents).  The trial court stated that it would not require Child to testify because it had "learned what [it] needed to learn," and "unless counsel wants to say anything about that, I think the sooner we let [Child] know that he doesn't have to come [to court], the better his day will be."  *Id.* at 95-96.

at 14. She added, "We provide a home for him. We provide food for him. We provide health insurance. We go grocery shopping and get him his favorite things. Everything. We provide everything for him." *Id.* at 23-24.

Maternal Grandmother emphasized that the ongoing custody litigation "is devasting for" Child, who sees a counselor and takes medication. *Id.* at 24, 30. However, she also testified that Child was doing well in cyber school and "is very resilient." *Id.* at 24. Maternal Grandmother described Child's close relationship with Maternal Grandfather, who has helped raise Child. *Id.* at 32.

With respect to Paternal Grandparents, Maternal Grandmother testified that she has encouraged Child to have a relationship with Paternal Grandmother in particular, but Child refuses and "just gets so upset." *Id.* at 31. She relayed that in June 2024,

> [Paternal Grandparents] came to the house [in an attempt to exercise partial custody]. [Paternal Grandfather] went over to the trailer. I was in the yard working in my garden. [Child] had himself locked in the trailer. [Paternal Grandfather] came back … and called the state police. The state police came to our home. Before that[, Child] ran into the woods, out the back door and into the woods, ran away … [b]ecause he didn't want to go. … [After Child returned, t]he state police came and talked to him[, and] the state police went back and talked to [Paternal Grandparents,] and they didn't make [Child] go.

*Id.* at 36.

Maternal Grandmother stated that she "feel[s] sad for [Paternal Grandmother] because [she and Child] need a relationship." *Id.* at 44. Maternal Grandmother testified that she would encourage Child to participate

- 11 -

in counseling with Paternal Grandparents, but did not believe that Child would do so. *Id.* at 45-46. She explained that even if Child attended counseling,

> [Child] is the type of person with a counselor or with anybody[,] he has to really get to know them and know that he can trust them. Like with his guardian [*ad litem*], he is afraid he can't trust him because he's an attorney[,] and he thinks that he is friends with [Paternal Grandfather].[5] [H]e is afraid of letting his guard down.

*Id.* at 46-47.

Finally, Maternal Grandmother described having to return to court as "mental abuse." *Id.* at 47. She explained:

> It has been ongoing [between grandparents] for four years. [Child previously] told the [trial court] three or four times where he wants to live. … He wants it done. He is 15. What normal 15-year-old wants to go through this constantly? It is time for healing. It is time for [Maternal Grandfather] and [Child] and I to heal from [Mother's] death[,] because we never have been able to because we've had court. I mean, I lost my daughter four years ago…. [Child] has been in his room [for] three days. He comes out to eat. He stays in his room and does his school work and won't come out. … Like I said, what normal 15-year-old wants to have this hanging over [his] head for four years? It needs to stop. It needs to end.

*Id.* at 48.

---

[5] The record does not indicate that the guardian *ad litem* communicated with Child. The guardian *ad litem* appeared at the hearing and questioned the witnesses, but did not express a position. On appeal, the guardian *ad litem* argues that "clear and convincing evidence established that the best interests at this time will best be served by awarding [M]aternal [G]randparents custody of [Child]." Guardian *Ad Litem*'s Brief at 8.

- 12 -

*Paternal Grandmother*[6]

Paternal Grandmother testified that she has eight children and twelve grandchildren. *Id.* at 144. She relayed that from the time Child was "18 months to 2 years old," until he was five-years-old, Father had custody "50 percent," and "would bring [Child] … to our place whenever, because we had to get to know him too." *Id.* at 105. Paternal Grandmother said that Father "would bring [Child] over [during his custodial] week, and we would see him, especially when [Father] was working, and then the other week [Child] would go … back and forth in the custody." *Id.* She confirmed that Paternal Grandparents saw Child when Father had custody, and Paternal Grandparents "didn't have our own custody order." *Id.* at 159.

Paternal Grandmother disputed Maternal Grandmother's account of caring for Child. She stated that Mother "was still in high school … when she had [Child, s]o of course she lived with [Maternal Grandparents] until she finished school." *Id.* at 107. She noted that Mother had married, separated, and filed for divorce, but "always had" Child. *Id.* Paternal Grandmother added:

> [Maternal Grandparents] lived right there. So when [Child] wanted to see the[m], he could. [B]ut they didn't parent him.

---

[6] As discussed more fully below, Paternal Grandmother was initially absent when called to testify. Before taking a midday recess, the trial court told the parties to return at "a quarter of 2 and be back by then, [w]hen we will hear from [P]aternal [G]randm[other]." *Id.* at 101. When Paternal Grandmother appeared at 2:05 p.m., the court advised Paternal Grandparents' counsel, "in terms of any consideration of time constraints in this case this afternoon, you … are already 20 minutes into her examination." *Id.*

- 13 -

They didn't take him to school. They didn't take him to his doctor appointments. … They didn't have custody of him. They just had the ability to be able to see him all the time because he lived right there in their place.

*Id.*

Paternal Grandmother stated that there "was always that contention between" Mother, Father, and Maternal Grandparents. *Id.* at 108. She testified that in 2020, Mother asked her, "can you take [Child?]" *Id.* at 111. According to Paternal Grandmother, Mother wanted her to have custody of Child because Mother was going through a divorce and Maternal Grandparents were trying to get Mother "back here or whatever because they had filed something." *Id.* Paternal Grandmother testified that "we all decided together[,] with [Father] and [Mother] and me[,] that [Child] would live with [me and Paternal Grandfather,] and [Child] would go to school [while living] with us, especially with it being virtual [due to the COVID-19 pandemic,] because everybody else had to be at work but I didn't." *Id.* She stated that she and Paternal Grandfather performed "all of the parental duties" for Child at that time. *Id.* at 137.

Paternal Grandmother acknowledged that in April 2021, shortly before Mother's death, Mother filed a petition to revoke her custody. *Id.* at 160. Paternal Grandmother claimed "nobody got served" and stressed that the petition "was never prosecuted." *Id.* She testified that after Mother's death on April 30, 2021, Maternal Grandmother

called to say [Mother] passed away and wanted to know if they could get [Child], to tell him[,] and if they could be the ones to tell him, and I said, sure…. It's not like I wanted to tell [Child]

- 14 -

that his mother had died.  I mean that was a heartbreaking thing to do, but … I respected that [Maternal Grandmother] had lost her daughter too.  So I said okay.  So they came and picked him up to take him to the funeral and stuff.

*Id.* at 112-13.

Paternal Grandmother explained that shortly after Mother's death,

[Maternal Grandparents] filed some kind of emergency [petition] … and they filed for modification of custody which we never got served with, didn't know about until after the hearing was over, and we saw that it was filed but not given to us, but … we had [Child].  We went to a court hearing, an emergency one.  Well, [Child] wasn't in an emergency.  [Mother] had killed herself, but we had custody and [Child] was doing fine.  So I don't know.  They ended up having an emergency hearing….  [The interim court order provided that Child] was going to finish out the school year with us, and then we were going to do 50-50 during the summer, which we did, until we came back for the next hearing which was in August [2021,] right before school started….  Even at that hearing[, Child] said he loved being with [us] and it's in the transcripts, you know.  There [are] two transcripts where [Child] … said he loved going one week on, one week off with both grandparents.  He was happy.

*Id.* at 113.  Paternal Grandmother reiterated that Child "loved all of us."  *Id.* at 134.

Paternal Grandmother recounted the parties sharing custody of Child "every other week in the summer and he was perfectly fine."  *Id.* at 118.  She explained:

Even going into the fall we went on a vacation … and, you know, we had a good time.  We started to see [Child] on the weekends and the days during the week.  We would go down and see him and that happened for several months, but then all of a sudden he had some reason why he wouldn't go with us anymore, and even though they would make him come with us, within two minutes of being in the car, with us, he would be jabbering on about his day and about things.  He was perfectly fine.  …  We

- 15 -

would take him back and he was perfectly fine, and he would text us, and we would have contact with him. Then all of a sudden around October it just ended for some reason. We have no idea. He just wouldn't come with us anymore. [Y]ou could tell from his grades from that year that he was flunking everything from that period on, but when he stopped seeing us in October his grades started flunking.

*Id.* at 118-19. Paternal Grandmother testified that Paternal Grandparents' most recent custody of Child occurred in October 2021, when "for some reason, he wouldn't … come [to] us." *Id.* at 121. She said, "we couldn't get him, and they weren't going to make him come anymore." *Id.* Paternal Grandmother also testified that her "last positive communication" from Child occurred by text in April 2023, although "not for us not trying." *Id.* at 145.

Paternal Grandmother confirmed that she and Paternal Grandfather attempted to exercise partial custody of Child in June 2024, after this Court's decision in *Hoover I*, and "figured we would call the … state police[,] and see if they would help, [and] there wasn't a fight or anything that happened because [Maternal Grandmother] had never said [Child] hates you, he doesn't want to come." *Id.* at 128. Paternal Grandmother testified that she had never known Child to feel unsafe or threaten self-harm. *Id.* She stated that Child "hates me for some reason, [but] I had nothing to do with [Mother committing suicide, and] I would never try to get him to hate [Maternal Grandparents,] but, you know, someday he will probably see it." *Id.* at 134-35. Paternal Grandmother added that she "wouldn't say anything negative about" Maternal Grandparents, but asserted that Maternal Grandmother "doesn't like us for some reason." *Id.* at 138, 145.

- 16 -

Paternal Grandmother expressed her desire for contact with Child and her belief that Child would benefit from counseling. *Id.* at 142. In response to her counsel asking her to "explain where you think we should go," she answered:

[W]e should all get together, go out to eat together, you know, be with [Child] as a united force, you know, get him into counseling, get us into counseling with him…. I can't believe all this time has gone by, another year has gone by. Obviously, you know, the Superior Court had everything and they know that he shouldn't have been taken from us. The Supreme Court knew he shouldn't have been taken from us. I mean his life could be totally different right now if all of this would not have occurred….[7]

\*\*\*

[A] counselor would know … that somebody doesn't commit suicide because what? What did we do, you know? … [Child] can't go his whole life hating us[,] thinking that we made [Mother] commit suicide. I don't want to throw [Maternal Grandparents] under the bus[, but Child] has to accept the fact that [Mother] couldn't handle life.

*Id.* at 142-43.

On cross-examination by Maternal Grandparents' counsel, Paternal Grandmother confirmed that her last overnight custody of Child was October 2021. *Id.* at 145. She then admitted that she had claimed and received Child's Social Security benefits from Mother's death, even though Child was not living with her. *Id.* at 150. Paternal Grandmother repeatedly justified her

---

[7] The trial court subsequently commented that prior judicial decisions "speak for themselves, and I don't mean to say that I agree with [Paternal Grandmother's] description of what the Superior and Supreme Court have done. I do not. I have tried to make that point with her counsel as well, apparently to no avail." *Id.* at 149-50.

actions, stating: "We have legal custody"; "We had legal custody"; "We had legal custody"; "We have legal custody." *Id.* at 150-53.  She said three times that she did not know when she filed for the benefits, but "it was probably back when the Superior Court reaffirmed our thing." *Id.* at 151-52.  When the trial court asked her how much money she received, Paternal Grandmother replied, "I don't know.  I don't remember.  I don't get it anymore.  I don't know." *Id.* at 152.

Maternal Grandparents' counsel questioned Paternal Grandmother:

Q. When did [your receipt of Child's Social Security benefits] stop?

A. I don't know.

Q. You don't know?

A. Ask [Maternal Grandparents].  They are the ones that asked for it to be stopped even though they didn't have custody.  The Supreme Court said we still had custody.

Q. You have demonstrated a very good memory about a lot of things, but you can't remember how much money you were getting from Social Security?

A. No.  That's not even something I worry about.

Q. You can't remember from when to when you were receiving Social Security?

A. I imagine from the Superior Court['s decision] until whenever [Maternal Grandparents] wrote to them saying that they had custody even though we still had legal custody from the Superior Court[,] and then the Supreme Court said we do too.  They just wouldn't hand him over.  Maybe [Maternal Grandmother] knows.

Q. Does seven hundred forty-nine dollars a month sound familiar?

A. It might.  I don't know.  I don't even touch it or look at it.

Q. Well, where is it?

A. It's in an account.

Q. Do you think it should go to [Child]?

A. It will go to [Child].

Q. The child was never —

A. We technically have custody.

Q. The child was never in your home —

A. So what? Because they wouldn't give him to us. Just because somebody keeps somebody doesn't mean they have custody. We have legal custody.

Q. So you acknowledge that [while C]hild was [not] in your care in your home, you were receiving Social Security from the government for [C]hild and you were receiving it that entire time?

A. Because the Superior Court said we have custody. So I don't know what is criminal about the Superior Court and the Supreme Court saying we have custody.

Q. You were receiving it even after th[e trial court ordered] that [M]aternal [G]randparents have primary custody?

A. Th[e trial court] didn't have the right to do that because it was pending before the Supreme Court. That's what they said. …

Q. You have collected over $5,000 for [Child] when he wasn't in your care from the government, didn't you?

A. I don't know. How would I know? I don't look at it. I don't know, and we have had him—we have had legal custody.

*Id.* at 152-54.

According to Paternal Grandmother, if Maternal Grandparents "would have given us custody last year like they were supposed to, it wouldn't still be going on." *Id.* at 155. She stated, "I believe [Child] is being abused by not allowing him to have contact with his paternal side when everything was perfectly fine through the whole court proceeding before, and now since

[Maternal Grandparents] have been the only ones to see him, all of a sudden he hates everybody." *Id.*

When Maternal Grandparents' counsel asked Paternal Grandmother about the adverse effects of litigation on Child, she testified:

A. [Maternal Grandparents] are the ones that have been prosecut[ing] the whole way through. They started it before [Mother's] death. They took it to the Supreme Court. It is still going on because of them. It is not us.

Q. How many appeals did you file?

A. Are you blaming me for this whole court process all these years?

Q. I am asking you. You are leaving yourself out of this?

A. I never started any of them.

Q. You are leaving yourself out of this?

A. I never started any of them.

Q. You never filed an appeal to the Superior Court?

A. Well, of course.

*Id.* at 165-66.

After the testimony concluded, the trial court remarked:

The question is where do we go from here[,] and the instruction, regardless of how we interpret who won and who lost, the Supreme Court's direction to me is rather specific. I am supposed to enter a [f]inal [c]ustody [o]rder in this case based on the current state of affairs. It is clear now[,] much after the fact[,] that [Maternal Grandparents] have standing. There doesn't seem to be much of an issue on that today. So the question then is what is in [Child's] best interest…. So that's where we are.

*Id.* at 172.

- 20 -

Counsel next presented closing arguments. Maternal Grandparents'
counsel requested that the trial court "maintain the status quo" of Maternal
Grandparents' sole legal custody and physical custody. *Id.* at 185. Paternal
Grandparents' counsel requested reunification counseling to "rekindle[e] that
relationship so we can get a strong and consistent [c]ustody [o]rder where
[Child] is able to spend considerable time with [Paternal Grandparents]." *Id.*
at 196-97.

At the conclusion of the hearing, the trial court advised, "so [Child] has
some sense of what happened, I do not intend to change the underlying
custody arrangement," and "will keep sole physical and legal custody in
[M]aternal [G]randparents[,] where [Child has] been for the [past] years[,]
under their loving and capable care." *Id.* at 198. On May 29, 2025, the trial
court entered an order and opinion. The order stated:

> [A]fter hearing and careful review of the testimony adduced, the
> court being satisfied that [M]aternal [G]randparents have met the
> conditions for standing and that the best interest of [C]hild will be
> served by granting them custody, it is ORDERED and DIRECTED
> that Sole Legal and Physical Custody of [Child] is awarded to
> [M]aternal [G]randparents.

Order, 5/29/25.

Paternal Grandparents timely filed a notice of appeal and concise
statement pursuant to Pa.R.A.P. 1925(a)(2)(i). They present three questions
for review:

> I. Whether the [t]rial [c]ourt erred and/or abused its discretion by
> entering an [o]rder … that was contrary to the best interests of

[C]hild by awarding exclusive sole legal and physical custody of [C]hild without any periods of custody in [Paternal Grandparents]?

II. Whether the [t]rial [c]ourt erred and/or abused its discretion by failing to follow the mandates of the [o]rder of the Supreme Court of Pennsylvania, dated April 29, 2025, which directed the [c]ourt to hold a custody hearing[,] and among other things, resolve any outstanding custody petitions. At the time of the entry of the [c]ourt's [o]rder of May 2[9], 2025, the [c]ourt had never ruled on two separate sets of Preliminary Objections filed July 26, 2024; a Petition to Reconsider and Vacate Order of November 13, 2024, filed December 12, 2024; and Omnibus Custody Petitions filed May 7, 2025, which included a Petition for Counseling, a Petition to Follow the Mandates of the Appellate Court Orders regarding the Purpose of the Remand Hearing, a Petition to Direct the Maternal Grandparents to provide all relevant information to the [c]ourt, and a Petition for Recusal[?]

III. [Paternal Grandparents] are also requesting the [Superior] Court to [r]econsider its initial denial of the[ir] Petition for Recusal … filed December 12, 2024, given the fact that in addition to the reasons set forth in that [p]etition, the [c]ourt showed further bias, prejudice or unfairness raising a substantial doubt as to the [court's] ability to preside over the proceedings impartially by berating [Paternal Grandmother] for being approximately 20 minutes late for the afternoon session of the hearing … when she was late because of a medical problem. The [c]ourt did not make any inquiries as [Paternal Grandmother] appeared in the courtroom and went directly to the witness stand, and the [c]ourt displayed an utter lack of appropriate judicial temperament by berating [Paternal Grandmother] and her counsel[,] and threatening them with the forfeiture of time in presenting their case. The [c]ourt acted in this fashion despite the fact that counsel for [Maternal Grandparents] was approximately 40 minutes late for the start of the proceedings. The [c]ourt's bias and prejudice is further reflected in its final order which completely denied any contact by any member of [F]ather's family and did not grant, at the very least, the request for counseling services between [C]hild and [P]aternal [G]randparents[?]

IV. Whether the [trial] court erred and/or abused its discretion in denying Paternal Grandparents' [p]etition for [r]ecusal where, in addition to the reasons set forth in that [p]etition, the [t]rial [c]ourt's conduct during the … proceedings[,] as well as at the earlier hearing on July 2, 2024, demonstrated bias, prejudice,

and/or unfairness that created a substantial doubt as to its ability to preside over the instant matter impartially?

V. Whether the [t]rial [c]ourt erred and/or abused its discretion by entering an [o]rder that completely excludes any contact between [C]hild and Paternal Grandparents[,] contrary to [C]hild's best interests[?]

Paternal Grandparents' Brief at 5-8.[8]

*DISCUSSION*

Paternal Grandparents' questions involve three issues which we address in turn: (1) the trial court's denial of Paternal Grandparents' recusal request; (2) the scope of the May 8, 2025 remand hearing; and (3) the substance of the May 29, 2025 custody order.

1. <u>Recusal</u>

Paternal Grandparents argue that the trial court should have recused from the proceedings, based on "actions prior to the May 8, 2025, hearing and during the hearing," and that "taken together, these errors deprived [Paternal Grandparents] of a fair proceeding." Paternal Grandparents' Brief at 39. This argument lacks merit.

We review the trial court's denial of Paternal Grandparents' recusal request for an abuse of discretion. ***Irish Holdings LLC v. EQT Prod. Co.***,

---

[8] Paternal Grandparents present five questions, but include only four (I, II, III and IV) in their summary of the argument, and four (I, II, III and V) in their argument. ***See*** Paternal Grandparents' Brief at 20-47); ***see also*** Pa.R.A.P. 2119(a) (stating that the argument in a party's brief "shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part--in distinctive type or in type distinctively displayed--the particular point treated therein").

330 A.3d 455, 464 (Pa. Super. 2025). A party seeking recusal of a judge must provide evidence of the necessity for a disqualification. *Id.* A trial judge should recuse whenever he has any doubt as to his ability to preside impartially, or whenever he believes his impartiality can be reasonably questioned. *Id.*

Here, counsel for Paternal Grandparents acknowledged at the May 8, 2025 hearing that the recusal issue had been raised and rejected by the trial court five months prior. *See* Order, 12/20/24 (trial court denying Paternal Grandparents' recusal motion). When Paternal Grandparents' counsel raised the issue at the May 8, 2025 hearing, the trial court responded:

> What basis for recusal do you have? I have no financial interest that entangles me with your clients whatsoever. I don't know anybody involved in this case. I have no reason to be biased or prejudiced for either side. I have been on the bench for 38 years. I cannot tell you how many hundreds of custody cases I have had. All you are telling me is they simply don't like my decisions so far. That is not a basis for recusal.

N.T. at 2-3. The trial court added, "I am not in the position to waste my time this morning anymore on this … [w]e need to find out what the best interest is for this child." *Id.* at 3.

Later that afternoon, when Paternal Grandmother was late returning to the courtroom, the following discussion occurred:

> [PATERNAL GRANDPARENTS' COUNSEL]: Judge, I've tried calling and also texting. I haven't gotten any response. I went down the hall to make sure [Paternal Grandparents] weren't perhaps thinking I was going to meet them in a conference room. I don't see them. I'm not sure what is going on, Judge. I apologize.

2:05 p.m.

[PATERNAL GRANDPARENTS' COUNSEL]: I will call [Paternal Grandmother], Your Honor.

BY THE COURT: All right. Now, as she approaches the stand in terms of any consideration of time constraints in this case this afternoon, you may assume that you are already 20 minutes into her examination. Am I understood?

[PATERNAL GRANDPARENTS' COUNSEL]: Your Honor —

BY THE COURT : Am I understood?

[PATERNAL GRANDPARENTS' COUNSEL]: You are understood, Your Honor, but with all due respect [Maternal Grandparents' counsel] was late [this morning]. I was here on time, and there was nothing said about that.

BY THE COURT: You cannot call yourself as a witness.

[PATERNAL GRANDPARENTS' COUNSEL]: I understand that.

BY THE COURT: Your witness is 20 minutes late.

[PATERNAL GRANDPARENTS' COUNSEL]: I understand that, Your Honor, but what I am saying—

BY THE COURT: You are 20 minutes into your time. Go.

[PATERNAL GRANDPARENTS' COUNSEL]: Your Honor —

BY THE COURT: Go.

[PATERNAL GRANDPARENTS' COUNSEL]: I get it. I don't understand the anger here. With due respect, Your Honor, I think—

BY THE COURT: With due respect is just fine when every courtroom that I know that I can think of, many, many judges, she would be in handcuffs right now.

[PATERNAL GRANDMOTHER]: I had a kidney transplant, and I had to go to the bathroom and take my medicine and go do all that stuff.

BY THE COURT: [Counsel] didn't say that when you first walked in the room.

- 25 -

[PATERNAL GRANDMOTHER]: He didn't know that.

[PATERNAL GRANDPARENTS' COUNSEL]: I didn't know what the problem was, Judge, but I can say that I waited here for [Maternal Grandparents' counsel] and that was okay because he must have run into traffic, but I am getting the impression that there may be a little bit of bias here against me and I will put that on the record because I am being treated differently by this [c]ourt.

BY THE COURT: There is no bias.

[PATERNAL GRANDPARENTS' COUNSEL]: I feel it.

BY THE COURT: I understand that. I understand that. We all sat here for 20 minutes and she walked—

[COUNSEL]: Why am I being chastised and my client being chastised when we waited this morning for 20 minutes for [Maternal Grandparents' counsel], Your Honor? I don't get it.

BY THE COURT: Very well. Go ahead.

*Id.* at 101-03.

After Paternal Grandmother testified, the trial court apologized. The trial court stated that it had "perceived a nonchalance on the part of [Paternal Grandmother] arriving while we are all sitting here for 20 minutes, and it was a misperception on my part. I lost my temper and I should not have." *Id.* at 175-76. The trial court said, "Please be assured that I have no bias," and "I have no bias, no bias against either side." *Id.* at 176.

As indicated above, the trial court expressed no "doubt as to [its] ability to preside impartially." *Irish Holdings LLC*, 330 A.3d at 464. There is nothing in the record to indicate otherwise. Thus, the trial court did not abuse of its discretion in denying Paternal Grandparents' request to recuse.

2. Scope of the May 8, 2025 Remand Hearing

Paternal Grandparents argue that the trial court erred in disregarding the Supreme Court's remand order and failing to rule on preliminary objections they filed in July 2024 (challenging Maternal Grandparents' standing); the petition to reconsider and vacate the November 13, 2024 custody order they filed in December 12, 2024; and the custody motions (seeking recusal and counseling) they filed on May 7, 2025, the day before the remand hearing. **See** Paternal Grandparents' Brief at 5, 27-28. This argument also lacks merit.

The trial court recognized the Supreme Court's instructions to "'make a fresh assessment of standing, resolve any outstanding custody petitions, and determine a final custody arrangement that will serve the best interest of the child.'" TCO at 1 (quoting **T.M.H. v. J.L.**, 334 A.3d 860–61, 29 WAP 2024 (Pa. filed Apr. 29, 2025) (per curiam order)). The trial court followed the Supreme Court's instructions in determining that Maternal Grandparents "have met the conditions for standing and that the best interest of the child will be served by granting them custody."[9] Order, 5/29/25. Thus, the trial court resolved Paternal Grandparents' preliminary objections pertaining to standing and their petition to reconsider and vacate the prior custody order.

---

[9] Although standing was not disputed at the hearing, we note that the Child Custody Act provides standing to persons who are *in loco parentis*. 23 Pa.C.S. § 5324(2). At the time of the hearing, Maternal Grandparents were *in loco parentis* because they had "assumed obligations incident to the parental relationship" with Child. **A.C. v. E.K.**, 331 A.3d 939, 946 (Pa. Super. 2025).

In addition, the trial court denied Paternal Grandparents' recusal request from the bench, and denied their request for reunification counseling in the opinion accompanying the May 29, 2025 custody order. **See** TCO at 7 (trial court stating it was "not satisfied that a court order requiring counseling is in [Child's] best interest, and [was] instead satisfied that it would only ensure the further litigation of this matter throughout what remains of his teenage years").

As the trial court observed, it was "directed … to set aside the tortured procedural history of this case and make a decision based on today's reality." TCO at 1-2. The record shows that the trial court did so. Paternal Grandparents' argument to the contrary is without merit.

3. The May 29, 2025 Custody Order

Paternal Grandparents argue that the trial court's award of sole legal and physical custody to Maternal Grandparents, and its decision to not order reunification counseling, "is clearly against [C]hild's best interests." Paternal Grandparents' Brief at 24.

We review the trial court's custody order for an abuse of discretion. **Rogowski v. Kirven**, 291 A.3d 50, 60 (Pa. Super. 2023). This Court has explained:

> We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the [trial court] who viewed and assessed the witnesses first-hand.

*Id.* (citation omitted). The trial court's discretion "should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned." ***B.S.G. v. D.M.C.***, 255 A.3d 528, 533 (Pa. Super. 2021) (citations omitted). The "knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record." ***Id.***

In challenging the trial court's order, Paternal Grandparents state that they "have a longstanding nurturing relationship" with Child, and cite Paternal Grandmother's testimony to support their claim that Child "would benefit from restoration of his relationship with Paternal Grandparents." Paternal Grandparents' Brief at 24, 53; ***see also id.*** at 24-27, 47-50. However, "parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child." ***See Smith v. Smith***, 281 A.3d 304, 312 (Pa. Super. 2022).

The record shows the trial court's consistent focus on Child's best interest, which involves factors that "affect a child's physical, intellectual, moral, and spiritual well-being." ***S.J.S. v. M.J.S.***, 76 A.3d 541, 554 (Pa. Super. 2013). Notably, the trial court considered the best-interest factors set forth in 23 Pa.C.S. § 5328(a). ***See*** TCO at 5-6. In addition, the trial court stated the reasons for its decision from the bench and in its written opinion.

*See* 23 Pa.C.S. § 5323(d) (requiring the trial court to "delineate the reasons for its decision on the record in open court or in a written opinion or order").[10]

At the conclusion of the hearing, the trial court announced that it would "keep sole physical and legal custody" with Maternal Grandparents, and noted the years that Child had been "under [Maternal Grandparents'] loving and capable care." N.T. at 198. With regard to counseling, the trial court stated:

> [B]oth parties seem to agree, I am happy to hear, that the best interest of [C]hild demands that this custody case be concluded. So that leaves the issue about which … you both seem to agree[,] and that is whether we can rekindle a relationship between [Child] and [P]aternal [G]randparents. If ever he will recover such a relationship will depend on [Paternal G]randparents' appreciation of the situation, the manner in which they reach out to him, and I think at the end of the day it is probably for them to decide how to do that, not for me, the Judge. I am not qualified to do that, but will take under advisement the issue and timing of reunification counseling. I am inclined to agree, however, and this I do need to think about, but inclined at least to initially agree that the threshold question of the reunification counseling should be whether it is in the best interest of [C]hild to begin with[,] and go from there.

*Id.* at 198-99.

The trial court subsequently issued its order and opinion, in which it specifically "resolve[d] issues of credibility in favor of [M]aternal [G]randmother." TCO at 4. The trial court explained:

---

[10] There "is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *A.V. v. S.T.*, 87 A.3d 818, 823 (Pa. Super. 2014) (citation omitted).

[P]aternal [G]randmother's testimony seems to … be marked by a superficial understanding of the events … and an attempt to completely discount any responsibility she bears for the discord in the family. There was testimony to the effect that, in the months leading up to her suicide, [M]other came to question her decision to leave [Child] with [P]aternal [G]randparents[,] and [M]other sought to obtain custody from them. As this process was unfolding, she committed suicide. Notably, [P]aternal [G]randmother did not even attend the funeral…. [I]t is clear that these events have left [Child] with an extreme dislike of [P]aternal [G]randparents.

… By the time the undersigned became involved, [P]aternal [G]randparents were attempting to enforce their rights and had even enlisted the assistance of the State Police. It was during one such episode that [C]hild hid from law enforcement and, at one point, threatened self-harm rather than go with [P]aternal [G]randparents.

… [C]hild, initially, refused to come to the courthouse for our hearing. He expressed to [M]aternal [G]randmother that he was deeply distressed by the squabbling which was occurring between his grandparents and had no desire to talk to 'yet another judge.' … In the meantime, it became apparent that he was otherwise being very well cared for. It was clear to us that he had a very close and loving relationship with [Maternal Grandparents] and that they reciprocated with warmth and affection.

We have carefully examined the testimony in this case in light of the statutory factors which we are required to consider in deciding custody cases. *See* 23 Pa.C.S. § 5328. [M]aternal [G]randparents will best ensure the safety of [C]hild. They have been his capable caregivers, calming these otherwise rough seas for most of [C]hild's life and, exclusively, for more than three years. … In terms of the assumption of parental duties, [M]aternal [G]randparents have exclusively performed them. Considerations of stability and continuity clearly militate in favor of [M]aternal [G]randparents. [Child] now is an A and B student and has had great support from [M]aternal [G]randmother in his academics. In terms of extended family, there is availability on both sides, but [Child] has not had a relationship with his paternal side for years. …

The custody factors also include an examination of the preference of the child. [Child] wants to live with [M]aternal [G]randparents.

Our inquiry also involves the question of the extent to which a party will encourage contact between the other party and the child. In that regard, we find [M]aternal [G]randmother credible in describing her efforts to encourage a relationship with [P]aternal [G]randparents. Unfortunately, she has not been very successful.

In short, examining the statutory factors as we must, it is clear that [Child] is not only well-off, but is thriving in his current living situation in the care of [Maternal Grandparents]. Moreover, it is now beyond peradventure that [Maternal Grandparents] have standing in this case to pursue primary custody.

In entering today's order, it is our hope to bring an end to this custody case. This litigation has loomed over [Child] to the degree that it is harmful. While it is arguably the public policy of this Commonwealth to maintain relationships between children and their grandparents, the maintenance of that relationship has always been secondary to the child's best interest. *See Rigler v. Treen*, 660 A.2d 111 (Pa. Super. 1995). At the end of our recent hearing, counsel for [P]aternal [G]randparents requested that we order some sort of reunification counseling. It may be that in future years [Child] will reconcile with [P]aternal [G]randparents and that existing wounds will be healed. We do not see that happening at this point by court order, let alone court-ordered reunification counseling. We simply are not satisfied that a court order requiring counseling is in [Child's] best interest, and are instead satisfied that it would only ensure the further litigation of this matter throughout what remains of his teenage years.

TCO at 4-7.

The record supports the trial court's assessment of Child's best interest.

Accordingly, the trial court did not abuse its discretion in granting sole legal and physical custody to Maternal Grandparents.

Order affirmed.

- 32 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: <u>2/26/2026</u>